**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------X
**SANDRA JEAN SIMPSON**, in her own
capacity and as Personal Representative
for the Estate of DR. MOSTAFA KARIM :

                            Plaintiffs,                          Civil Action No.1:00CV01722
          vs.

**THE SOCIALIST PEOPLE'S LIBYAN ARAB
JAMAHIRIYA**

                          Defendant.
-------------------------------------------------------X

# THIRD AMENDED COMPLAINT

       Pursuant to this Court's order of January 10, 2008, Sandra Simpson, by and through her counsel, files this Third Amended Complaint on her own behalf and as personal representative of the Estate of Mostafa Karim.    Voluntarily and by decision of this Court, the causes of action of the prior complaints have been reduced to only those common law torts, which may be pled under the law of the Commonwealth of Pennsylvania.  Also pursuant to the decision of this Court, no allegations of fact have been added or deleted from this amended complaint.

       This action for pain and suffering and financial damages arises out of the unlawful capture and subsequent detention by the defendant of Ms. Simpson and her husband, Dr. Mostafa Karim in 1987.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1330(a).

2.    The defendant does not enjoy immunity from this action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 (a)(7) after the judicial determination by this Court that defendant committed acts of 'hostage-taking' against both plaintiffs (Decision and Order of the Honorable Ricardo M. Urbina, dated March 7, 2005.  Affirmed by the United States Court of Appeals, District of Columbia Circuit, on November 21, 2006).

3.    The defendant country  may be found liable for all common law claims enumerated herein in the same manner as a private individual pursuant to 28 U.S.C. § 1606.

4.    Venue for this action properly lies in this District Court pursuant to 28 U.S.C. § 1391 (f)(4) and 18 U.S.C. § 2334(a).

## SOURCE OF LAW

5.    The law to be applied for all counts herein is that of the Commonwealth of Pennsylvania.

## PARTIES

6.    Plaintiff Sandra Jean Simpson, is a United States citizen born, raised and currently residing in Saxonburg, Pennsylvania and  Dr. Mostafa Fahmy Karim, husband of Ms. Simpson.  He died of cancer in Saxonburg, Pennsylvania in 1993.

7.    Defendant Socialist People's Libyan Arab Jamahiriya (hereafter known as "Libya"), is a foreign state and government with jurisdiction over lands located on the Mediterranean Sea in North Africa.

# STATEMENT OF FACTS

## Specific Acts Committed Against Plaintiffs

8.    During February 1987, plaintiff Sandra Jean Simpson and Mostafa Fahmy Karim were

passengers on a private yacht, the Carin II, registered in St. Vincent and the Grenadines, on a

voyage in the international waters of the Mediterranean Sea from Messina, Italy to Chania,

Crete. Three others were also on board: the Belgian captain of the Carin II, Frank

Boussemaere, his wife, Mirella Bongaerts, (also a certified Belgian captain) and Peter Weyers,

a German national (marine electrician and mechanic). Neither the plaintiff nor any of the other

passengers and crew (hereafter known collectively as the "Carin Party") ever intended to sail

in the direction of the North African coast or within territorial waters claimed by Libya

9.    On February 7, 1987, the Carin II had transited approximately one-third of its intended

course, when an unpredicted storm with severe Force-10 winds from the north forced the

captain to veer directly to the south to avoid being swamped by the storm swell.  After two

days of fighting the storm, the boat was critically low on fuel and its main engine had broken

down. Contact was established with Japanese, Russian and Libyan freighters which were in

the area, but none could change course and offer assistance because of the severity of the

storm.

10.    On February 10, 1987, in response to a general radio distress signal from the Carin II, in

which the identities and nationalities of all passengers were made known, Libyan harbor

authorities in Benghazi radioed the Carin II, which was in international waters, and offered the

crew and passengers of the Carin II the port of Benghazi as a safe harbor. The captain of the

Carin II notified Benghazi harbor authorities of their intention to continue their journey to

Greece as soon as the storm had subsided. Harbor authorities then radioed permission to enter the harbor, take on fuel and then continue their voyage.

11.    Later on February 10th,the Carin II entered the Port of Benghazi and was guided into the harbor to a mooring by a harbor pilot boat.

12.    Initially, representatives of the Harbor Authority offered to refuel the vessel and provided the crew with maps and directions for navigating a course back out to international waters.

13.    Members of the Carin Party were not allowed to leave the boat except to empty garbage and guards prevented any attempt to communicate with other boats.

14.    On the evening of February 11, 1987, other Libyan agents, not identified as being with the Harbor Authority, questioned Sandra Simpson for about twenty minutes, being asked only questions about ownership of the boat, how the party came to Libya and if she had ever been to Palestine (meaning Israel). Each person was taken off the boat separately and returned to the Carin II after being questioned. The total time for questioning the Carin Party by representatives of the defendant was about six hours. In every instance, the agents spoke the native language of the individual being questioned.

15.    After the initial questioning at the harbor, none of the members of the Carin Party were questioned further during their period of captivity in Libya. In particular, no questions were asked nor accusations made concerning their background, contacts with intelligence services of other countries, details of their travels or their reasons for taking their Mediterranean voyage.

16.    On February 12, 1987, a camera crew, purported to be from the government-controlled Libyan National Television, interviewed and made a video of members of the Carin Party on the boat. The next day, members of the Carin Party were told the film would not be shown on television.

17. On February 14, 1987, other members and representatives of defendant, acting in the scope of their agencies and employments, forcibly removed the Carin Party from the boat and detained them in a local government-run hotel, the Uzo, prohibiting them from leaving the hotel and blocking all telephone calls attempted from their rooms.

18. During their detention at the Uzo, Plaintiff Sandra Simpson managed to briefly communicate secretly in the hotel lobby to a Canadian businessman telling him that she and others in her group were being held captive at the hotel, and asked if he could inform their families of their whereabouts.

19. All calls from the Carin Party's room were prohibited.  However, three incoming calls were inadvertently routed to the Carin Party's rooms by the hotel switchboard. When it was discovered that these calls had come in, all incoming calls to the Carin Party were then also blocked.

20. Despite prior assurances that they were soon to be released, the Carin Party was suddenly and without warning forcibly removed from the Uzo Hotel in Benghazi at around midday on March 1, 1987 and driven in a hotel van for five hours to the Green Mountains in Eastern Libya.

21. At no time was the party informed of their destination or the reason for their sudden removal from Benghazi. Mostafa Karim overheard their driver and guards in the van telling the guards manning checkpoints along the way that they were, "foreign tourists on the way to the Green Mountains".

22. The Carin Party was driven up into and through the Green Mountains to a state-controlled building, which may have formerly been a hotel, located either in or around the town of Derna. They arrived after dark in a rainstorm and were locked into a suite of four rooms on the top floor. There was no heat or electricity and they were given candles for light.

23.     The building in which they were held also housed foreign military personnel and advisors from the U.S.S.R. There were frequent power cuts and their quarters were often without electricity or light. The quarters were damp and unheated, with nighttime temperatures at times dipping to two degrees above freezing.

24.     None of the members of the Carin Party was provided with additional clothing or blankets suitable for protecting them from the cold and damp they experienced. With room temperatures just above freezing, the plaintiff suffered greatly due to a chronic medical condition, arachnodactyl, that renders her highly sensitive to cold and damp and results in her experiencing chronic low blood pressure and poor circulation.

25.     While being held, Plaintiff and other members of the Carin Party were not allowed to see or otherwise communicate with anyone outside their immediate party. They were not allowed out of their rooms for twenty-six consecutive days and they were told they would be shot if they attempted to leave their rooms.

26.     After being locked in their rooms for nearly an entire month, members of the party were finally allowed out on an enclosed adjoining roof patio for limited periods of time. At great risk to her life, the plaintiff managed to surreptitiously communicate with two of the wives of Russian military personnel staying in the building.  From the roof of the building, the plaintiffs witnessed many hundreds or perhaps thousands of uniformed military personnel marching in formation in the street below.

27.     At one point in her captivity, the plaintiff was told by the officer in charge that the group could be shot or not depending on orders he received.

28.     On three separate occasions, during the period the Carin Party was held captive, the Government of Belgium, the "Protecting Power" for U.S. interests in Libya, presented the defendant with a demarché, demanding information concerning of the welfare and

whereabouts of their nationals and the plaintiff. Defendant did not respond to any of the three demarchés, neither denying, nor confirming that the Carin Party was being held in Libya.

29. After being held for two-and-a-half months in the Green Mountains, the Carin Party was awakend by security agents shortly before midnight on May 12, 1987 and told that they would be leaving the following morning at 6:00 a.m. in the morning of May 13th. That morning the Carin Party was driven to the Benghazi Airport and placed on a Libyan Arab Airways scheduled passenger flight to Tripoli, still under guard. Until they landed in Tripoli, they had no idea where they were being taken and were never told why they were being moved again.

30. Soon after their arrival in Tripoli, plaintiff Sandra Simpson was forcibly separated from her husband by members and representatives of defendant. She was not told why he was being taken away from her, or where they were taking him.  She was not told whether she would ever see him again. Ms. Simpson was not to learn of her husband's welfare or whereabouts until he was released, without prior notice to plaintiff, seven months later.

31. After Mostafa Karim was taken away, Ms. Simpson, the German national and the two Belgian nationals were taken to State Security Headquarters in Tripoli. They were still under guard and continued to be denied communication with their embassies. They were then put in the Yasser Hotel near State Security Headquarters, under guard, where they spent the night of May 13.

32. Plaintiff Simpson and two Belgian members of the Carin Party were turned over to the Belgian Embassy on May 14, 1987.

33. The Belgian ambassador officially requested the Libyan Government to return the passports of Ms. Simpson and the two Belgian Nationals, but was informed by Libyan authorities that plaintiff Simpson and the others would not have their passports returned and they would not be permitted to leave Libya.

34. The Ambassador then issued them "laissez-passez" documents, which are emergency

documents that temporarily replace a passport in order to permit the bearer to exit one country and enter another. Very rarely does an embassy ever issue such documents.

35.    The following day all telecommunications in and out of the embassy were cut by the Libyan authorities for a period of 24 hours.

36.    The Ambassador then informed the Libyan government that if they did not immediately return the passports of Ms. Simpson and the two Belgian nationals  and grant them official permission to leave the country, he would close the embassy and take them, and all Belgian mission staff, out of the country under his own diplomatic umbrella.

37.    The Libyan government responded to this by returning their passports, but without any form of exit visas. Because permission to leave was only issued verbally, the Belgian Ambassador then personally accompanied them to the airport and put them on their Swissair flight to Zurich.

38.    After being separated from his wife, Dr. Mostafa Karim, a U.S. Protected Person, was detained in solitary confinement in unlighted, unfurnished and highly unsanitary conditions without adequate medical care or proper food for a period of seven months. The only material he had available for personal hygiene use was cloth ripped out of a bloody mattress.  Out of a discarded sofa cover he sewed a shirt and pants using thread from the cover using a needle he made out of a thorn.

39.    Dr. Karim existed in his cell for many days at a time without any human contact. The only sounds he heard were screams of other captives held elsewhere in the prison. He was never told how long he would be confined, nor was he assured that he would not be killed.

40.    After her release, Sandra Simpson traveled to the United States and then back to Cairo to press both governments, as well as Amnesty International and the International Red Cross, to pressure Libya into revealing the welfare and whereabouts of Mostafa Karim, and to the

secure his release.

41.    While the plaintiff was in Cairo, and without the protection of her husband, she was mistreated and harassed by Mostafa Karim's influential Egyptian family who used their influence to illegally break into and take over the apartment she shared with Mostafa Karim (the apartment was returned to her by the Supreme Court of Egypt in 1998). They also illegally prevented access to funds in her bank account and thwarted her attempts to gain employment as a teacher.

42.    Mostafa Karim was released from captivity in November 1987, only after intense negotiations among the governments of Belgium, Egypt and Libya.

43.    Dr. Karim was severely weakened physically and emotionally as a result of his ordeal in Libyan prisons.

44.    At the time of his capture by the Libyan government, Mostafa Karim was developing a hotel and resort property in Hurghada, Egypt on the Red Sea on land that he had personally purchased from the government and on which he had already built an 82 room hotel, 7 shops and a restaurant as part of the first phase of the project. As he was one of the pioneers of Red Sea as a scuba diving and tourist destination, he was in the position to purchase the best possible location for such a project, consisting of 45,000 sq. meters of prime land and another approximately 50,000 sq. meters of additional beach-front land added to the project by the government.

45.    Directly as a result of being held hostage by Libya, Dr. Karim's businesses and financial affairs in Egypt were irretrievably damaged after an eighteen month absence and due to his complete inability to communicate with his partners, managers, bankers and concerned government officials.

46.    Because he had fallen behind schedule due to his captivity in Libya, the Egyptian government

confiscated two thirds of the project land without notice, making the third he had built on useless for further development. Dr. Karim was litigating this matter in Egyptian courts when he died.

47.   Before Dr. Karim was taken captive in Libya, he was meeting with top management of a number of major hotel chains (Marriott, Sonesta, Sabena, Conrad, Club Med, Sheraton and ten others) who were expressing great interest in investing and become involved in his Neptune Marina project. But when he returned from Libya after eighteen months away, his business in ruins and personal credibility damaged, these potential investors were no longer interested in talking with him about investing in this project.

48.   At the time of Dr. Karim's detention, the Sheraton and Club Med were the only two hotel resorts on the whole of the Red Sea. Today, nearly every major hotel chain is represented in and around Hurghada, and there are hundreds of hotels and resorts actively operating there, including a successful major hotel and diving complex built on the land he formerly owned.

49.   Dr. Karim lost his investment and all of his savings as a result of the failure of the hotel and resort project. He also lost his business reputation and credibility as well. Dr. Karim found it impossible to raise further project capital or to interest potential partners in other business opportunities. Also, as his health was rapidly deteriorating, he could no longer work in his professional field of Petroleum Engineering.

50.   Dr. Karim was diagnosed with cancer in 1992 and died in Allegheny General Hospital in Pittsburgh in August 1993. He and his wife, Sandra Simpson, were then on government assistance and just before he died they had moved into a small trailer near the home of Ms. Simpson's parents, such was their financial state.

51.   Neither the plaintiff, nor any member of the Carin Party committed any offense against the laws of Libya or any universally recognizable international law.

52.    While in the custody of the defendant, no member of the Carin Party was accused of any criminal offense (including espionage), nor was any third party informed of such an accusation, including officials of the governments representing the nationalities of the members of the Carin Party (the United States, Belgium, Egypt and Germany).

53.    Despite having reasonable knowledge that concerned outside parties suspected the Carin Party was being held somewhere within Libya, diplomatic agents of the defendant willfully failed for several months to respond to inquiries of their 'welfare and whereabouts' from their respective governments and the International Red Cross, as required under established international treaties and conventions.

54.    During the entire period of forced detainment in Libya neither the plaintiffs, nor any member of the Carin Party were informed by their captors of the reason for their detention, nor were they asked about the Carin II as being a possible platform for espionage activities, nor were they asked if they themselves were agents of foreign powers.

**<u>Factual Background Establishing Motive</u>**

**Prevention of Further U.S. Air Attacks - "Human Shields"**

55.    Defendant Libya has been designated by the United States Department of State as a *state sponsor of terrorism* under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)).

56.    On December 27, 1985, attacks at airports in Rome and Vienna killed five Americans and fourteen others. These acts were believed by intelligence agencies of several nations to have been ordered by the Libyan-sponsored international terrorist, Abu Nidal.

57.   On January 1, 1986, Colonel Qaddafi said he would 'welcome' an Israeli or American attempt to retaliate for the airport raids, but warned that it would result in war in the Mediterranean, with Libyans harassing "American citizens in their own streets".

58.   At a news conference on January 7, 1986, President Reagan announced economic sanctions against Libya in response to the Rome and Vienna airport attacks. He stated "if the economic sanctions do not end Qaddafi's terrorism, I promise you that further steps will be taken".

59.   At the same news conference, President Reagan called all remaining Americans in Libya "potential hostages" and ordered the evacuation of 1,500 Americans still in Libya.

60.   In January 1986 Libya suggested to Prime Minister Craxi of Italy, Libya's largest trading partner, that if Italy could persuade the United States not to attack Libya, Libya will move to stop terrorism in Europe.

61.   On January 23, 1986 the United States sent two aircraft carrier battle groups to the Mediterranean near Libya launching flights into the disputed Gulf of Sidra region across Qaddafi's "line of death".

62.   The *Washington Post* reported on January 24, 1987 that President Reagan sent an envoy to Egypt to discuss the coordination of potential military action against Libya.

63.   On April 5, 1986, two U.S. servicemen and others were killed by a bomb placed in the "La Belle" disco in Berlin by agents of the Libyan secret service. (The agents responsible were convicted in a German court on November 13, 2001).

64.   On April 13, 1986, the *New York Times* reported that Libya was removing Libyan military personnel from military bases and replacing them with foreign workers to act as 'human shields' against any United States air attack.

65.   In retaliation for the Berlin terror bombing, the United States Air Force launched eighteen F-111's in "Operation El Dorado Canyon" - a raid against targets in Tripoli and Benghazi

including Qaddafi's personal compound on April 14, 1986. An adopted daughter of Qaddafi was reported killed.

66.     On February 22, 1987, the *New York Times Sunday Magazine* published as its cover story, Target Qaddafi, by Seymour M. Hersh, concluding that the April 1986 U.S. air attacks on Libya were specifically calculated to kill Qaddafi and his family, and that such efforts were likely to continue.

67.     Seven days after publication of the Hersh article, which suggested that further U.S. attacks on Libya and Qaddafi himself were probable, the Carin Party was suddenly and secretly removed from the Uzo Hotel in Benghazi to a State Security controlled building in a militarized area in the Green Mountains near the town of Derna.

**Revenge/Compensation for U.S Air Attack**

68.     An intelligence report published in October 1997 entitled, *Department of Defense Response to Transnational Threats*, stated the following: "The popular belief for years was that [the April 1986 air strike] suppressed Libyan activity in support of terrorism. However, an examination of events in subsequent years paints a different picture. Instead, Libya continued, through transnational actors, to wage a revenge campaign over a number of years." The incident of the Carin II occurs right in the middle of this period which, according to this report, saw the murder of American hostage, the bombing of the USO in Naples, the arrest of terrorists in New Jersey planning pipe bomb attacks in New York City, the hijackings of Pan Am Flight 73 and the murder of passengers and crew onboard both Pan Am 103 and a French UTA airliner. All these, as well as other incidents, were attributed either to Libyan Intelligence Services or contracted by them to Abu Nidal, the Japanese Red Army, and others.

69.    In their own courts, Libya has indicted nine U.S. officials, including Former White House

       officials John Poindexter and Oliver North for the April 1986 bombing of Tripoli and

       Benghazi.

70.    Libya has circulated a draft resolution in the U.N. General Assembly calling for United States

       compensation for damages caused by the April 1986 military action.

71.    Colonel Muammar Qadaffi said in a Newsweek interview that the United States must pay

       compensations for the Libyans who were killed in the 1986 attack.

72.    In recent pronouncements, the same Libyan government in power in 1987 has indicated that

       full cooperation with families of victims of the Pan Am 103 and French UTA bombing would

       be conditioned on receiving compensation for the U.S. air attack on April 15, 1986.


                            **Exchange for Egyptian Military Hardware**


73.    Libya invaded neighboring Chad in August 1983 in an attempt to overthrow the government

       of Hussein Habre who was backed by the United States, France and Egypt.  The costly and

       unpopular war continued for several years with a significant military reversal occurring in

       April 1987 when Chadian forces retook northern airfields capturing a significant amount of

       weaponry including aircraft, tanks, and sophisticated Soviet missile systems.  The war cost

       Libya some 7,500 casualties and at least $1.5 billion.

74.    Relations between Libya and Egypt deteriorated throughout the 1980's because of Egypt's

       support for Chad, the Camp David Accords, and perceived friendly relations with the United

       States. Assassination plots against Hosni Mubarak by Libyan agent are revealed during this

       period.

75.    On or about February 28, 1987, a top-ranking Libyan Colonel - equal in rank to Colonel

Qaddafi - and five airmen flew their C-130 transport to Egypt, landing at Abu Simbel on Egypt's southern border with Sudan and asking for political asylum. The C-130 was one of only seven of these American-built transports possessed by the Libya Air Force at the time.

76.  In the early morning of March 1, 1987 the Carin Party was suddenly and without warning forcibly removed from the Uzo Hotel in Benghazi and driven by State Security agents to a building somewhere in, or near, the town of Derna in the Green Mountains where they were locked under guard in a building controlled by Libyan military and revolutionary security personnel. This building also housed Russian military advisors.

77.  On March 29, 1987 three Libyan airmen fighting in the Chad War defected to Egypt in a Chinook helicopter asking for political asylum.

78.  On April 1, 1987, while the Carin Party was being held in Libya, Egyptian President Hosni Mubarak stated publicly that his government would not return Libyan aircraft flown to Egypt by Libyan defectors until Tripoli freed Egyptians it was holding.

79.  On April 2, 1987 (while Ms. Simpson and the Carin Party were being held) the Associated Press released an article titled, "North Yemen Mediates Swap Of Egyptian Prisoners For Libyan Aircraft."

80.  Despite the defendant's continued denials, further indications that the Carin Party was indeed probably being held in Libya prompted heavy coverage of their plight in Belgian newspapers. During the week of May 5, 1987 a number of front-page stories put considerable editorial pressure on the Belgium government to do something to secure the release of the hostages. The families of the Belgian hostages gave interviews to the press and publicly petitioned the government for information about their family members, urging action to secure their release.

81.  On May 9, 1987 a major Belgian newspaper, *De Morgen,* reported speculation that at a recent meeting in Cairo, Belgian Prime Minister Tindemanns discussed the fate of the Egyptian and

Belgian members of the Carin party with Egyptian President Hosni Mubarak.

82.   On information and belief, Prime Minister Tindemanns and President Mubarak specifically discussed the possibility that the Belgians could be included in his offer to trade planes for Egyptian prisoners.

83.   In the early hours of the morning of May 13, 1987, the Carin Party was transported by car to Benghazi and placed on a Libyan Airways flight to Tripoli, where all parties, except for Dr. Karim, were released to their respective embassies (German and Belgian). The two Belgians and Ms. Simpson were confined within the Belgian embassy for another week before they finally were given their passports and verbally allowed leave Libya on May 19.

84.   On information and belief, the defendant conditioned the release of the plaintiff and her companions either explicitly or implicitly on the return of Libya military personnel and material lost to Egypt. The refusal to allow the plaintiff to leave the country, having released her to the Belgian embassy, resulted from either a failure to fully consummate an explicit transaction or the failure of Belgian, Egyptian or U.S. authorities to accept the *quid pro quo* for their release.

85.   On information and belief, Dr. Karim was not released at this time for the reasons stated in paragraph 90, and continued to be held as a 'bargaining chip' against possible future losses of military assets to Egypt.

86.   After being transported to Tripoli with the other members of the Carin Party, Dr. Karim was pulled from the group on May 13th and transported to a secret location where he remained imprisoned in solitary confinement for seven months.

87.   News reports quote Egyptian diplomats as believing that Mostafa Karim was among a group of seven to eleven Egyptian civilians who were known to have been kidnapped, or otherwise taken against their will by Libya, and who were being forcibly held there.

88.    During this period, Mr. Abdul Meghahed, a representative of the opposition Egyptian Socialist Labor Party traveled to Libya to meet with eight Egyptian nationals being held as spies. Mostafa Karim <u>was not among this group of accused spies</u> and Libyan authorities did not acknowledge his being in the country when asked after by Mr. Meghahed.

89.    Alfred Isler, a representative of the International Red Cross stationed in Cairo, told the Associated Press that while Libya will not confirm they have Mostafa Karim, they have confirmed "tacitly to different quarters" that he was still in Libya.

90.    On July 16, 1987, a Libyan Air Force captain and two staff officers were granted political asylum in Egypt after landing their ME-8 helicopter in Egypt's Western Desert.

91.    In September 1987, the Belgian Ministry of Foreign Affairs Counselor Affairs Officer, Mr. Lambrecht, told officials of the United States Department of State that Egypt was working through Belgium to locate Mostafa Karim in Libya and to secure his release.

92.    Judge Abdelrehim Amer, a former General Public Prosecutor of the Egyptian Supreme Court, stated that Mostafa Karim was being held by the Libyans, who were demanding the return of the Libyan colonel, who had defected to Egypt with a C-130 transport aircraft and its crew.

93.    On information and belief, the C-130 transport flown to Egypt in late February 1987 was, at some point, returned to Libya as subsequent inventories by international armament experts confirm that Libya still has all seven American-built C-130's they had prior to the flight of one of the seven to Egypt in 1987.

94.    On information and belief, Dr. Mostafa Karim, in part, was held until November 1987 for the return of Libyan military assets lost to Egypt in February and July 1987.

## **Defendant's Pattern of Terrorist Activity: Hostage-Taking**

95.     Before and after the 1987 detention of the Carin Party, defendant, directly or through its

agents, engaged in similar behavior of hostage-taking and bargaining with Western interests

for the release of their citizens being held by Libya directly, or by terrorists groups under

Libya's control which. Under Rule 404(b) of the Federal Rules of Evidence, these facts

constitute competent evidence of intent or motive in the instant case.

96.      As noted in the State Department's report, *Patterns of Global Terrorism: 1991*, it is well

established within the international intelligence community that Libya was a major sponsor of

Abu Nidal, providing him and his terrorist organizations with material support for carrying out

numerous acts of murder and hostage-taking in the 1980's.

97.     In May 1984, a Norwegian ship, the *Germa Lionel*, and its crew were detained by Libyan

authorities for ten weeks. One crewmember dies after reports he was "tortured to death".  The

crew was released after the ship's owner pays 200,000 Pounds U.K. Sterling to the Libyan

authorities.

98.     Six British nationals were jailed in Libya during April/May 1984 on various charges. Two

detainees are released as a 'goodwill gesture' after a visiting delegation of Labor MP's is told

by the Libyans that the British prisoner could be released in exchange for Libyans held in

Britain.

99.     Terry Waite, envoy for the Archbishop of Canterbury, made several trips to Libya in 1984-85

and meets with Libyan diplomats, leaders of radical student groups and Qaddafi himself to

secure the release of the remaining four British hostages. It is suggested by Libyan diplomats

that the prisoners could be exchanged for re-establishment of diplomatic relations with the UK

and either the release of, or better treatment of Libyan prisoners in the UK.

18

100.  On January 4, 1985, Colonel Qaddafi publicly addresses the People's Congress – ostensibly the body having the authority to release the prisoners. He tells the group that they might want to wait to make a decision to release the hostages "based on a British response".

101.  Immediately after the United States air attack on Tripoli on April 14, 1986, the captives of Blake Kilburn "sold" him for $3 million to the Libyan-sponsored group, Arab Revolutionary Cells, who claimed responsibility for his murder on April 17. Libyan agents in Lebanon stated that Libya wanted an American hostage to kill in retaliation for the bombing.

102.  Italy and Libya complete a prisoner exchange on October 6, 1986.  Italy frees three Libyan convicted prisoners for four Italians held in Libyan Jails.

103.  On May 23, 1987, Brig. General Kanaan, Syria's Chief of Intelligence, told *Le Figaro* that "one of several French hostages in Lebanon has been sold to the Libyans…they serve as a means of pressure against the French government in the [Chad] conflict".

104.  The Italian government issued a formal protest to the Libyan authorities on October 29, 1987 after reports that Colonel Qaddafi had threatened to hold Italians in Libya as hostages unless there was a rapid agreement on Libyan claims arising from the Italian occupation from 1911 to 1942.

105.  In November 1987, Abu Nidal's Fatah Revolutionary Council (FRC) took responsibility for seizing a passenger boat, the *Silco,* in the Mediterranean, along with nine Belgian and French passengers. Some press account reported that the boat was originally captured by a Libya gunboat and turned over to the FRC.

106.  On December 29, 1988 two young French girls, who were on the *Silco* when it was captured, were released by Abu Nidal as a response, he claimed, to the pleas of Colonel Qaddafi. Press reports quoted western diplomats as saying that all of the *Silco* hostages were actually being held in Libya.

107.   On April 10, 1990 three more of the French hostages were freed in Libya after the French government asked Qaddafi to intervene with the FRC to release the hostages. This episode was widely criticized in the French and international press with diplomatic sources reporting that the releases were part of a deal, agreed to in March, in which France would return three Mirage jets that had been impounded as part of the 1986 arms embargo, resume French grain sales to Libya, restore shipping and telecommunications links between the two nationals and reduce French military presence in Chad.

108.   Support for international terrorism "in the past" is admitted by Col. Qaddafi in a 1989 interview in the Egyptian magazine *Al Mussawar*.

109.   In June 1989, a Belgian Doctor, Jan Cools, who had been held in Lebanon by terrorist Abu Nidal's group, Al Fatah, was released to a Belgian Trade Minister, Robert Urbain, after an appeal by Moammar Qaddafi. The previous week, Urbain himself met with Qaddafi and agreed to unfreeze a $60 million trade credit.

110.   On January 12, 1991 Belgium released Said Nassar, an Al Fatah guerrilla and convicted murderer of a Jewish child in 1980 in exchange for the release, January 6, of the remaining four Belgians originally seized on the Silco in 1987. Belgium sent Said Nassar directly to Libya.

111.   On March 1, 1988, the crews of four Libyan MIG-23 fighters landed in Egypt requesting political asylum. The aircraft was returned to Libya on March 9 following the return of 36 Egyptian 'detainees'.

112.   In April 1998 a deputy of the Italian Parliament negotiated for the release of an Italian couple held by Libya for more than seven months in return for his making strong public statements against the international sanctions imposed on Libya.

## CAUSES OF ACTION
### (Under Pennsylvania Law)

### COUNT I: FALSE IMPRISONMENT

113.    Sandra Simpson repeats the allegations of paragraphs 8-112 as if fully set forth at length.

114.    The defendant committed acts of false imprisonment against the victim-plaintiffs by

abducting, and holding them at various locations against their will for a period of several

months under threat of death for no stated legal reason, without the filing of formal charges or

due process and never informing them of their eventual fate until at, or immediately prior to,

their actual release.

115.    In addition, Dr Karim was forcibly separated from Ms. Simpson and detained in solitary

confinement in primitive dungeon-like conditions: unlighted, unfurnished and highly

unsanitary without adequate medical care or proper food for a period of seven months.

116.    Release of victim-plaintiffs was obtained only after negotiations with the defendant by the

Government of Belgium, the U.S. Protecting Power at the time.

### COUNT II: BATTERY

117.    During the period of her confinement, agents of the defendant physically handled both victim-

plaintiffs, without their permission, with undue force and in a humiliating and degrading

manner causing long-term physical and mental harm.

### COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

118.    Plaintiff Sandra Simpson repeats the allegations of paragraphs 8-112 as if fully set forth at

length.

119.    Through the extreme and outrageous acts of its agents and employees acting within the scope

of their offices, the defendant intentionally caused the plaintiff, Ms. Simpson,  by suddenly

and without warning, removing her husband from her while both were in custody,  causing

him to 'disappear' for a period of seven months during which she, along with the United States and Belgian Governments were rebuffed in their efforts to gain any information as to his welfare, whereabouts  or even his continued existence.

120.   As a result of being threatened with imminent death during captivity; engaging in strenuous and highly stressful efforts to secure her husband's release; coping with their declining financial position and being witness to the physical and psychological impact of her husband's captivity, the plaintiff experienced severe emotional distress and pain and suffering which continues to this day.

## COUNT IV: LOSS OF SOCIETY AND SOLATIUM

121.   Plaintiff repeats the allegations of paragraphs 8-112 as if fully set forth at length.

122.   During the period of her detention, Sandra Simpson suffered the loss of the assistance, society, and companionship of her mother, father and brother.

123.   During the period of her husband's detention, Sandra Simpson suffered the loss of his assistance, society, companionship and consortium.

124.   Due to the injury to her husband's mental and physical health caused by the duration and conditions of his confinement, plaintiff suffered the loss of his assistance, society, companionship and consortium for an extended period up until his death from cancer in 1993.

# DAMAGES

## COUNT V: PAIN AND SUFFERING

125.   The defendant committed the following willful and outrageous acts against Sandra Simpson

and Dr. Karim, including but not limited to: detaining them in secret locations around Libya

against their will, placing them in unheated quarters in the winter, failing to meet basic

dietary, clothing, sanitary and healthcare needs and with intentional and willful cruelty,

preventing any means of communication with them or the outside world, making credible

threats against their lives and the lives of their loved ones, refusing to inform them of the

reason or the prospective length of her detention, willfully refusing to inform them of whether

their detention would end with her death, separating them from each other for several months,

causing Dr. Karim severe mental distress over the fate of his wife, his family and his business

during his period of solitary confinement, and cruelly refusing to reveal to anyone the welfare

or whereabouts of  Dr. Karim causing Sandra Simpson to travel around the world pleading

governments and private entities to help to obtain information about him and  aid in his

release.

126.   As a direct result of these acts, the victim-plaintiffs suffered the following: loss of freedom

and dignity, fear of immediate death, fear of prolonged confinement, deprivation of any

human contact for extended periods, several physical and emotional suffering, permanent loss

of health, loss of dignity, emotional distress for him and their families.

127.   By reason of the foregoing, defendant is liable for compensatory damages to the plaintiff in

the sum of TWENTY MILLION DOLLARS ($20,000,000).

## COUNT VI: ECONOMIC DAMAGES

128.   As a direct result of her captivity and her efforts to locate and secure her husband's release after she was freed, and then after his release during which she attempted to help her husband regain his prior financial condition as well as seeking redress for the acts of the defendant, Sandra Simpson sustained the loss of productive time, and the loss of career and employment opportunities.

129.   During the period of Dr. Karim's forced confinement, plaintiffs suffered the loss of his on-going income, permanent damage or loss of his established business and investments and  the subsequent inability to engage in and capitalize on potentially lucrative business ventures due to his absence as well as from his progressively diminished mental and physical health caused by the duration and conditions of his confinement until his death.

130.   Specifically, the illegal and tortuous confinement of Mostafa Karim by the defendant was the proximate and actual cause of the cancellation of an Egyptian Government contract for a hotel and resort on the Red Sea he was developing at the time of his captivity, as well as the loss of ownership to the raw land where the development was being built.

131.   By reason of the foregoing, defendant is liable for compensatory damages to the plaintiffs in the sum of FORTY MILLION DOLLARS ($40,000,000).


 WHEREFORE, plaintiff Sandra Simpson for herself and as Personal Representative of the Estate of Mostafa Karim prays that judgment be entered for each of Counts I through V against defendant in the amount of SIXTY MILLION ($60,000,000) DOLLARS, plus pre-judgment interest, costs, and any further relief that this Court may find just and proper.

Dated: Brooklyn, New York
            January 23, 2008

 /s/ Eric C. Sorenson

Eric Sorenson
Attorney for Plaintiffs
 52 East Second Street
Brooklyn, New York 11218
(212) 266-1243 / (718) 871-3661
DC Bar No. NY0024